UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                              :

EVA LENNERT-GONZALEZ,                                          :

                          Plaintiff,                      :                  11 Civ. 1459 (JMF)

               -v-                             :                 <u>OPINION AND ORDER</u>

DELTA AIRLINES, INC. and ASHA CUTTING,  :

              Defendants.         :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Eva Lennert-Gonzalez, a woman of Hungarian origin, brings this action against her former employer and supervisor alleging discrimination on the basis of national origin, a hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 *et seq.* Defendants now move for summary judgment, arguing that Lennert-Gonzalez's claims are unsupported by the evidence. For the reasons stated below, Defendants' motion is granted, and Lennert-Gonzalez's complaint is dismissed.

## FACTS

      The following facts, taken from the complaint and the parties' motion papers, are viewed in the light most favorable to Lennert-Gonzalez, as she is the non-moving party. On April 14, 1998, Lennert-Gonzalez began working for Delta Airlines ("Delta") as a flight attendant. (Pl.'s 56.1 Counter Statement of Material Facts ("Pl.'s 56.1 Counter Statement") ¶ 17; Opp'n Mem. 1). Lennert-Gonzalez was required to provide customer service to passengers, handle safety and emergency situations, and implement instructions from the cockpit, among other duties.

(Rosenstein Decl. Ex. 2; Pl.'s Dep. 44-46). Each flight attendant was supervised by a Field Service Manager ("FSM"), who was responsible for ensuring that the flight attendants under his or her supervision — numbering in the hundreds at any one time — complied with Delta's policies and federal regulations. (Cutting Dep. 12-13). In July 2006, as a result of reorganization, Defendant Asha Cutting became Lennert-Gonzalez's FSM. (Pl.'s 56.1 Counter Statement ¶ 19; Opp'n Mem. at 1).

When Cutting became Lennert-Gonzalez's FSM, Lennert-Gonzalez had already been warned or "coached" several times regarding her job performance, uniform compliance, and comportment. (Rosenstein Decl. Ex. 5; Pl.'s 56.1 Counter Statement ¶ 24). In 2005, for example, she was verbally warned about engaging in rude and discourteous behavior towards a co-worker. (Rosenstein Decl. Ex. 6; Pl.'s Dep. 63-69). In March 2006, she was verbally warned again for failing to comply with Delta's uniform guidelines and for "accost[ing]" another flight attendant regarding issues they had as roommates. (Rosenstein Decl. Ex. 7). Such incidents continued after Cutting became Lennert-Gonzalez's FSM. In October 2006, for example, Lennert-Gonzalez wrote an arguably belligerent e-mail to Delta's Language Coordinator. (Rosenstein Decl. Ex. 8). In response, Cutting met with Lennert-Gonzalez and cautioned her about the need to control her emotions and to treat her co-workers with respect. (Pl.'s Dep. 80-87; Cutting Dep. 19-23, 40). In November 2006, Lennert-Gonzalez was coached again about uniform compliance. (Pl.'s Dep. 70-74; Cutting Dep. 47).

Several months later, Lennert-Gonzalez's disciplinary problems intensified. In or about May 2007, Lennert-Gonzalez's flight leader on a trip reported that she had been rude and disruptive on the flight and had refused to turn off her cellphone when asked. (Rosenstein Decl.

Ex. 10). When questioned about the incident, Lennert-Gonzalez said that the flight leader was "just jealous because [she was] young and better looking than [the flight leader was]." (Rosenstein Decl. Ex. 10; Pl.'s Dep. 91). Cutting asked Lennert-Gonzalez to submit a statement about the incident and subsequently met with her. (Rosenstein Decl. Ex. 11). Cutting issued no formal written discipline, but she did give Lennert-Gonzalez a "very [s]trong verbal warning" and coached her on the need to conduct herself professionally and to be respectful to her co-workers. (Rosensten Decl. Ex. 5).

On November 11, 2007, Lennert-Gonzalez was reassigned from a three-day trip to a four-day trip to Shannon, Ireland. (Rosenstein Decl. Ex. 13; Pl.'s Dep. 134, 145). Although Lennert-Gonzalez had previously been scheduled to take the fourth day off, she was technically on standby status, which meant that she was subject to being called for flight duty if needed. (Rosenstein Decl. Ex. 12; Cutting Dep. 44). Nevertheless, Lennert-Gonzalez refused to take the flight to Shannon. She explained that her son was in the hospital, and therefore she did not want to be away from New York for four days. (Rosenstein Decl. Ex. 13; Pl.'s Dep 145-46). According to Delta, the scheduling manager told Lennert-Gonzalez that in such a situation she should have informed Delta about her inability to work prior to receiving the new assignment. (Rosenstein Decl. Ex. 13). Her absence could then have been coded as a Managed Time Out ("MTO"), which would have signified that she had to drop the trip due to unforeseen circumstances. (Cutting Dep. 41). Plaintiff, however, did not want the absence designated as an MTO due to concerns about her overall attendance. (Rosenstein Decl. Exs. 13, 18; Pl.'s Dep. 147-48).

Shortly after the incident, Lennert-Gonzalez wrote to Cutting criticizing Delta's

scheduling department. (Rosenstein Decl. Ex. 13). Cutting discussed the situation with the base manager and then reached out to Lennert-Gonzalez. Cutting told Lennert-Gonzalez that her refusal to fly was a violation of company policy, but indicated that it was understandable given her personal situation. (Rosenstein Decl. Exs. 12, 16; Cutting Dep. 41). Cutting offered to retroactively treat the situation as an MTO without any disciplinary consequences, provided that Lennert-Gonzalez submitted documentation of her son's hospitalization. (Rosenstein Decl. Ex. 16; Pl.'s Dep. 146-48; Cutting Dep. 41). Lennert-Gonzalez refused. (Pl.'s Dep. 134-42). Instead, she sought to meet with her base manager and sent an e-mail to Joanne Smith, Delta's Senior Vice-President for the In-Flight Service Division, asking for a new FSM. (Rosenstein Decl. Exs. 14, 15; Pl.'s Dep. 111-17, 121-28). Cutting, meanwhile, continued efforts to collect documentation from Lennert-Gonzalez to permit her to code Lennert-Gonzalez's absence as an MTO. (Cutting Dep. 49-50).

On January 10, 2008, Lennert-Gonzalez met with Cutting and Brian Rivera, a new FSM to whom she was to be transferred. At the meeting, Cutting reiterated her request for documentation of Lennert-Gonzalez's son's hospitalization. (Rosenstein Decl. Ex 18; Pl.'s Dep. 145-148). Once again, Lennert-Gonzalez refused. (Rosenstein Decl. Ex. 18; Pl.'s Dep 145-48). Moreover, shortly after the meeting, Lennert-Gonzalez confronted Cutting in the breakroom in a manner Cutting found intimidating. (Rosenstein Decl. Ex 18; Pl.'s Dep. 149-51; Cutting Dep. 28, 50). She told Cutting she did not want to "deal with her anymore" and to "back off." (Rosenstein Decl. Ex. 15, 18; Pl.'s Dep. 150-51).

Four days later, Cutting issued Lennert-Gonzalez a warning letter with respect to the Shannon incident, the rules governing Lennert-Gonzalez's assignment to that trip, and Lennert-

4

Gonzalez's behavior. (Rosenstein Decl. Ex. 12; Pl.'s Dep. 153). In light of the circumstances, Cutting decided it would be best not to transfer Lennert-Gonzalez to a new FSM. (Cutting Dep. 30-31). Lennert-Gonzalez refused to sign the warning letter and instead hired an attorney, Michael Levai, who sent two letters on Lennert-Gonzalez's behalf to Michele Parker, Delta's Human Resources Managing Director for the In-Flight Service Division. (Rosenstein Decl. Exs. 19, 20; Pl.'s Dep. 169-70). In the letters, Levai criticized Cutting's supervision of Lennert-Gonzalez and demanded that Delta transfer Lennert-Gonzalez to a new supervisor. (Rosenstein Decl. Exs. 19, 20). Delta declined to do so.

In August 2008, a Delta gate agent submitted a complaint to Cutting alleging that Lennert-Gonzalez had been rude and disruptive in front of Delta passengers while flying on "Non-Revenue Travel" (that is, free or deeply discounted air travel, available to Delta employees) to Santo Domingo. (Rosenstein Decl. Ex. 21; Pl.'s Dep. 184; Cutting Dep. 56). Cutting asked Lennert-Gonzalez to submit a written report of the incident and to meet with her. (Rosenstein Decl. Ex. 21). Cutting also informed Lennert-Gonzalez that although her request to be transferred to a new FSM would be granted, Cutting would be responsible for completing the investigation into the current incident. (Rosenstein Decl. Ex. 21). Although Lennert-Gonzalez submitted an e-mail approximately one month later reporting her version of the events, she refused to meet with Cutting. (Rosenstein Decl. Ex. 22; Pl.'s Dep. 187). In the e-mail, Lennert-Gonzalez threatened to take "further action" should her demand for a new supervisor not be granted. (Rosenstein Decl. Ex. 22). Cutting again requested a meeting, but Lennert-Gonzalez refused to appear. Instead, Levai sent another letter to Delta, similar to the previous letters he had sent. (Rosenstein Decl. Exs. 15, 23; Pl.'s Dep. 201).

Cutting continued her efforts to set up a meeting with Lennert-Gonzalez to no avail. (Rosenstein Decl. Ex. 25). Then, on October 15, 2008, Lennert-Gonzalez wrote to Cutting and another Delta official demanding that they leave her alone. (Rosenstein Decl. 25). She also wrote a series of e-mails to an executive at Delta thanking him for transferring her to a new FSM and complaining about Cutting. (Rosenstein Decl. Ex. 26).

On November 3, 2008, Lennert-Gonzalez was placed on formal probation. (Rosenstein Decl. Ex. 24). The probation was based on her failure to show improved comportment and her persistent disruptive behavior. (*Id.*). Lennert-Gonzalez refused to sign the probationary letter. (*Id.*). Around the same time, Lennert-Gonzalez was assigned to a new FSM, Aphrodite Milonopoulos, after which she and Cutting had no further interactions. (Pl.'s Dep. 231-32; Cutting Dep. 34).

The transfer to a new FSM did not resolve Lennert-Gonzalez's problems. Instead, in March 2009, Milonopoulos received a complaint from a Transportation Safety Administration ("TSA") security agent about Lennert-Gonzalez's behavior during a security screening. (Rosenstein Decl. Exs. 27, 28; Milonopoulos Dep. 51). According to the TSA agent, Lennert-Gonzalez — while dressed in her flight attendant uniform — complained about having to be screened and loudly asked a waiting passenger "what she was looking at." (Rosenstein Decl. Exs. 15, 27, 28; Pl.'s Dep. 234-38). A Delta representative spoke to Lennert-Gonzalez about the incident on March 15, 2009. In the following days, Lennert-Gonzalez sent e-mails to Milonopoulos and another Delta official complaining that the incident had been blown out of proportion and that she was being harassed. (Rosenstein Decl. Ex. 29; Pl.'s Dep. 234-38). Milonopoulos and her colleague, David Gilmartin, began to investigate the incident pursuant to

Delta policy. (Rosenstein Decl. Exs. 28, 30; Milonopoulos Dep. 52-54). Lennert-Gonzalez, however, refused to meet with them or to submit any documentation about the incident, other than a brief e-mail. (Rosenstein Decl. Exs. 30, 31; Pl.'s Dep. 244-45). Thereafter, Lennert-Gonzalez refused Milonopoulos's and Gilmartin's requests to meet to discuss the incident. (Rosenstein Decl. 30-32; Pl.'s Dep. 258-64; Milonopoulos Dep. 46).

On April 1, 2009, Milonopoulos gave Lennert-Gonzalez a week to set up a meeting and warned Lennert-Gonzalez that failure to do so would result in a recommendation of termination. (Rosenstein Decl. Ex. 32). On April 6, 2009, Lennert-Gonzalez's attorney sent a letter to Marguerite Taylor, a lawyer in Delta's General Counsel's office, stating that Lennert-Gonzalez was prepared to take legal action to remedy what, in her view, was "continuing discrimination, harassment, and retaliation" and "requesting a meeting in which a resolution can be discussed." (Pl.'s Aff. Ex. D). The letter was not sent to Milonopoulos and did not mention, let alone try to schedule a meeting to discuss, the TSA incident. (*Id.*) Lennert-Gonzalez made no attempt to schedule such a meeting, and, accordingly, Milonopoulos recommended that she be terminated for job abandonment. Lennert-Gonzalez was notified of that recommendation by letter dated April 8, 2009. (Rosenstein Decl. Exs. 33, 34, 37). Pursuant to official policy, Milonopoulos's recommendation was reviewed by Delta's managers and formally approved on June 5, 2009. (Rosenstein Decl. Exs. 34-37). Cutting was not involved in Lennert-Gonzalez's termination in any way; in fact, she did not even learn of it until after the termination had occurred. (Cutting Dep. 34; Milonopoulos Dep. 41).

## DISCUSSION

Lennert-Gonzalez claims that Delta and Cutting discriminated against her on the basis of

her national origin, created a hostile work environment, and retaliated against her, all in violation of Title VII, the NYSHRL, and the NYCHRL. In addition, she alleges that Cutting "aided, abetted, incited, compelled, and/or coerced" unlawful discrimination against her in violation of the NYSHRL. Defendants move for summary judgment on all of Lennert-Gonzalez's claims.[1]

## A. Standard of Review

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Summa v. Hofstra Univ.*, — F.3d —, No. 11 Civ. 1743, 2013 WL 627710, at *5 (2d Cir. Feb. 21, 2013). A dispute about a material fact is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio*

---

[1] Although Lennert-Gonzalez sues Cutting under Title VII, that statute does not provide for individual liability. *See Spiegel v Schulmann*, 604 F3d 72, 79 (2d Cir. 2010). Accordingly, Lennert-Gonzalez's Title VII claim against Cutting must be dismissed at the outset.

*Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  Affidavits submitted in support of or in opposition to summary judgment must be based on personal knowledge, "set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

**B.  National Origin Discrimination**

Lennert-Gonzalez claims first that Defendants discriminated against her because she is Hungarian.  Because she seeks to prove national origin discrimination indirectly through circumstantial evidence, her claim is evaluated using the three-step *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (applying the *McDonnell Douglas* framework to claims under Title VII and the NYSHRL); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) ("[A] a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII.").  Under that framework,

> the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination.

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (internal citations and quotation marks omitted).

To establish a prima facie case of discrimination, Lennert-Gonzalez must show that: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discrimination. *See id.* at 107. Defendants do not seem to dispute that Lennert-Gonzalez has satisfied the first three elements: She is Hungarian and is therefore a member of a protected class; she "possesses the basic skills necessary for performance of [her] job," *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted); and she was terminated, an adverse employment action.

Defendants argue that Lennert-Gonzalez's prima facie case fails on the fourth prong — that is, they argue she has not demonstrated that her termination occurred under circumstances giving rise to an inference of discrimination. (Defs.' Mem. Supp. Summ. J. at 15). Lennert-Gonzalez counters that she has indeed established this element because she was "subjected to a series of baseless disciplinary actions because of her national origin and [because] she, a woman of Hungarian descent, was subjected to discipline that members outside her protected class were not." (Opp'n Mem. at 13). Evidence of disparate treatment based on national origin would certainly give rise to an inference of discrimination. *See, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). Whether Lennert-Gonzalez has marshaled enough such evidence here, however, is a close question. Nevertheless, the Court need not and does not resolve that question because, even if Lennert-Gonzalez were able to establish a prima facie case of national origin discrimination, her claim would fail at the third step of the *McDonnell Douglas* analysis.

Turning to the second step, Defendants have plainly articulated a legitimate, nondiscriminatory reason for their actions. Defendants contend that the disciplinary actions

Lennert-Gonzalez cites, including her ultimate termination, were not the result of discrimination, but rather the consequence of Lennert-Gonzalez's inappropriate behavior, refusal to comply with her supervisors' documentation and meeting requests, and failure to abide by Delta regulations.[2] The record strongly supports this contention.  Indeed, there are numerous documented occasions, beginning in June of 1998 (less than two months after she began working for Delta), when Lennert-Gonzalez violated Delta policy, displayed inappropriate behavior, or demonstrated unsatisfactory job performance.  (*See* Rosenstein Decl. Ex. 35).  Notably, these incidents occurred not only when Lennert-Gonzalez was supervised by Cutting — the only FSM she asserts discriminated against her — but before and after that period as well.  (*See* Rosenstein Decl. Exs. 6, 7, 35).  Furthermore, several of the complaints about Lennert-Gonzalez's comportment and job performance did not originate from Cutting or any other FSM, but rather from other Delta employees and, in one case, from a TSA agent.  (*See, e.g.*, Rosenstein Decl. Exs. 9, 10, 27).  Ultimately, Delta terminated Lennert-Gonzalez for job "abandonment" after she repeatedly refused to meet with her FSM regarding the TSA agent's complaint and was explicitly warned that failure to attend such a meeting would be treated as job abandonment.

Because Defendants have asserted — and, indeed, have produced evidence demonstrating — that they acted for legitimate, nondiscriminatory reasons, they are entitled to summary judgment on Lennert-Gonzalez's discrimination claim unless there is sufficient evidence in the

---

[2] It is far from clear that the disciplinary incidents prior to Lennert-Gonzalez's termination even qualify as "adverse employment actions" within the meaning of the employment discrimination laws.  *See, e.g.*, *Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions.").  For purposes of this decision, the Court will assume they do.

11

record from which a reasonable jury could conclude by a preponderance of the evidence that Defendants' disciplinary actions against, and eventual termination of, Lennert-Gonzalez were based, at least in part, on her national origin. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008). Lennert-Gonzalez has failed to carry this burden. First, with respect to the disciplinary actions, Lennert-Gonzalez has offered no evidence, aside from her own conclusory assertions, that she was disciplined for any other reason other than her unsatisfactory job performance and inappropriate behavior. To the contrary, as discussed above, the record strongly supports Defendants' contention that Lennert-Gonzalez was disciplined due to her unsatisfactory behavior and job performance. Put simply, there is no evidence whatsoever that the people who complained about Lennert-Gonzalez's subpar performance or the people who disciplined her for it were animated by discriminatory intent; indeed, Cutting aside, there is no reason to believe that these people even knew that Lennert-Gonzalez is Hungarian.

With respect to her termination, Lennert-Gonzalez contends that Defendants' assertion that she was fired because of job abandonment is pretextual. In support of this assertion, she raises two arguments. First, she argues that she could not have been fired for job abandonment because she did not abandon her job. (Opp'n Mem. at 18). The evidence in the record, however, is entirely to the contrary. In fact, Lennert-Gonzalez does not dispute that, despite repeated requests from Milonopoulos and another Delta supervisor, she failed to schedule a meeting to discuss the TSA incident; that she received a letter dated April 1, 2009 warning her that if she did not schedule this meeting by April 7, 2009, Milonopoulos would assume that she no longer wished to be employed by Delta; and that she did not respond to it by the deadline. (Pl.'s 56.1 Counter Statement ¶¶ 108-10). (As noted above, Lennert-Gonzalez's lawyer did send a letter on

April 6, 2009 to Delta's Law Department regarding "the continuing discrimination, harassment and retaliation" Lennert-Gonzalez alleged she had "been forced to endure." (Pl.'s Aff. Ex. D). The letter, however, was not sent to Milonopoulos and did not mention, let alone try to schedule a meeting to discuss, the TSA incident. (*Id.*). There is no evidence in the record that Milonopoulos was even aware of the letter's existence.) Lennert-Gonzalez's argument that she did not abandon her job is thus entirely unsupported by the evidence in the record.

Second, Lennert-Gonzalez argues that Delta's reason for firing her should not be credited because Delta previously offered conflicting reasons for her termination. (Opp'n Mem. at 18). Lennert-Gonzalez supports this contention by pointing to Delta's statement to the Equal Employment Opportunity Commission ("EEOC") that her "employment was terminated because she confronted passengers at the airport security checkpoint while in her Delta uniform after being placed on disciplinary probation, and then she evaded Delta's attempts to address the confrontation with her." (Pl.'s Counter Statement at ¶ 129). Contrary to Lennert-Gonzalez's assertions, however, this explanation is entirely consistent with Delta's justification of her termination on the ground of abandonment. Indeed, job abandonment as Delta uses that term here is nothing more than Lennert-Gonzalez's "eva[sion of] Delta's attempts to address the confrontation with her," despite being informed that continued evasion would be considered job abandonment. Giving the EEOC the backstory to Lennert-Gonzalez's job abandonment does not constitute proffering conflicting reasons.

In short, there is no evidence in the record suggesting that Defendants' asserted reasons for disciplining and eventually terminating Lennert-Gonzalez were pretextual. Nor is there any evidence that indicates in any other way that Defendants acted, even in part, with a

discriminatory motive. Because no reasonable jury could find otherwise, Defendants are entitled to summary judgment on Lennert-Gonzalez's national origin discrimination claim.

## C. Hostile Work Environment

Next, Lennert-Gonzalez claims that she was subject to an unlawfully hostile work environment due to her national origin. Under Title VII and the NYSHRL, a work environment is hostile when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted); *see Summa*, 2013 WL 627710, at *5 ("Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard."). Under the NYCHRL, by contrast, a plaintiff need only prove she was "'treated less well than other employees because of her'" membership in a protected class. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012) (quoting *Williams v. City of New York Hous. Auth.*, 872 N.Y.S.2d 27, 29, 39 (1st Dep't 2009)). Even under this more lenient test, however, "petty slights or trivial inconveniences" do not constitute a hostile work environment. *Id.* (internal quotation marks omitted). Moreover, under any of these statutes, workplace hostility is not actionable unless it is due to plaintiff's membership in a protected class. *See, e.g.*, *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *Davis-Bell*, 851 F. Supp. 2d at 675.

Here, Lennert-Gonzalez claims that Cutting was hostile towards her at least in part because she is Hungarian. She has offered, however, no evidence demonstrating that this is so. Indeed, she concedes that neither Cutting nor any other Delta employee ever made any

derogatory comment about Hungarians or "suggested animus towards people of Hungarian national origin." (Pl.'s Counter Statement ¶ 115). Taken most favorably to Lennert-Gonzalez, the evidence might suggest that Cutting was indeed hostile toward her, but that such hostility was due to personal animus. (*See, e.g.*, Rosenstein Decl. Ex. 15 (Lennert-Gonzalez noting "you can tell [Cutting's] harassing is personal and has nothing to do with my performance"); *id.* Ex. 29 ("I always look nice and very professional. That was the major reason that Ms. Asha Cutting harassed me and she took her jealousy too far . . . . It was all personal.")). Personal animus, however, is insufficient to establish a claim under Title VII, the NYSHRL, or the NYCHRL. *See, e.g.*, *Vaughn v. City of New York*, 06-CV-6547 (ILG), 2010 WL 2076926, at *12 (E.D.N.Y. May 24, 2010) (noting that "personal animus not on account of national origin does not implicate the anti-discrimination laws" (citing *Reece v. New York State Dep't of Taxation and Fin.*, 104 F.3d 354 (Table), 1996 WL 665625, at *3 (2d Cir. 1996))). Because Lennert-Gonzalez has not demonstrated that she was subject to hostility based on her national origin, her hostile work environment claim fails, and Defendants are entitled to summary judgment.

**D.  Retaliation**

Lennert-Gonzalez also claims that her employment with Delta was terminated in retaliation for her complaints of employment discrimination. (*See* Compl. ¶ 34). The *McDonnell Douglas* burden shifting framework applies to claims of retaliation under Title VII, the NYSHRL, and the NYCHRL. *See, e.g.*, *Gorzynski*, 596 F.3d at 110; *Moccio v. Cornell Univ.*, No. 09 Civ. 3601 (PAE), 2012 WL 3648450, at *39 (S.D.N.Y. Aug. 27, 2012) ("Courts apply the same standard used in Title VII cases in analyzing NYSHRL retaliation claims." (internal quotation marks omitted)); *id.* at *40 ("The same analysis used for retaliation claims under Title

VII applies to retaliation claims under the NYCHRL" except that "there is no requirement that the employee suffer a materially adverse action" (internal quotation marks omitted)). To establish a prima facie case of retaliation,

> a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected activity under the anti-discrimination statutes, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal alterations and quotation marks omitted); *accord Summa*, 2013 WL 627710, at *7. If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action. *See Summa*, 2013 WL 627710, at *7. If the employer carries this burden, then "[t]he burden shifts . . . back to the plaintiff to establish . . . that the employer's action was, in fact, motivated by discriminatory retaliation." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001); *see also Summa*, 2013 WL 627710, at *11 (providing that, at the third step of the *McDonnell Douglas* framework, "the plaintiff must show that retaliation was the determinative factor").

      In the present case, Lennert-Gonzalez has established a prima facie case. First, taken in the light most favorable to her, the evidence demonstrates that Lennert-Gonzalez engaged in protected activity, most obviously in the form of her lawyer's April 6, 2009 letter. *See, e.g.*, *Summa*, 2013 WL 627710, at *8 ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination." (internal alterations and quotation marks omitted)). That letter, addressed to Delta's legal department, expressly asserted that Lennert-Gonzalez had been subjected to different treatment from her

"similarly situated non-Eastern European" colleagues. (Pl.'s Aff. Ex. D). Next, the evidence is undisputed that Delta received Lennert-Gonzalez's communications, including the April 6, 2009 letter, and that Lennert-Gonzalez's termination qualifies as an "adverse action." Finally, Plaintiff has carried her "minimal" burden with respect to the fourth prong of the prima facie standard, *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005), which demands proof that a causal connection exists between the protected activity and the adverse action. The Second Circuit has "regularly held that the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Summa*, 2013 WL 627710, at *9 (internal quotation marks and alteration omitted). Here, the short time between Lennert-Gonzalez's counsel's letter to Delta and her termination — two days — is plainly sufficient to support an inference of a causal connection for purposes of the fourth prong. *Cf. Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (holding that an interval of twenty days between protected activity and adverse action was sufficient evidence of causation and citing additional cases in which a similar interval was held sufficient).

      Although she has established a prima facie case, Lennert-Gonzalez's retaliation claim ultimately fails for the same reason that her national origin discrimination claim fails. Defendants assert that Lennert-Gonzalez was terminated because of her long history of disciplinary problems, ultimately culminating in job abandonment. (Defs.' Mem. Supp. Summ. J. at 17-18). As explained above, this is a legitimate, nondiscriminatory justification supported by the record. Therefore, Defendants are entitled to summary judgment unless there is sufficient evidence in the record from which a rational factfinder could conclude that retaliation was, in

fact, "a 'substantial' or 'motivating' factor." *Raniola*, 243 F.3d at 625 (quoting *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000)); *see also Summa*, 2013 WL 627719, at *11 ("In assessing whether a plaintiff has established that an adverse employment action was motivated by discriminatory retaliation, there are two distinct ways for a plaintiff to prevail — either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." (internal quotation marks omitted)).  There is no such evidence here.  For the reasons explained above, Lennert-Gonzalez's contentions that Delta's asserted reason for terminating her — job abandonment — is pretextual fail.  Nor does she offer any evidence that Delta operated with a retaliatory motive.  Therefore, Defendants are entitled to summary judgment on Lennert-Gonzalez's retaliation claim.

### E. Aiding and Abetting

Lennert-Gonzalez's final claim is that Defendant Cutting "aided, abetted, incited, compelled, and/or coerced" unlawful discrimination against her in violation of the NYSHRL. (Compl. ¶ 35).  Because, as explained above, Lennert-Gonzalez's discrimination claims fail, so too does her aiding and abetting claim. *See Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) ("[L]iability under the [NYS]HRL and the NYCHRL must first be established as to the employer/principal before an individual may be considered an aider and abettor.").

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED and Lennert-Gonzalez's complaint is DISMISSED.  The Clerk of Court is directed to terminate

the motion (Docket No. 16) and to close this case.

SO ORDERED.

Dated: February 28, 2013
      New York, New York

_____
JESSE M. FURMAN
United States District Judge